IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
June 24, 2008 Session

## MICHAEL DERRICK HUSKINS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Polk County**
**No. 07-023     Carroll Ross, Judge**

_____

**No. E2007-02627-CCA-R3-PC - Filed September 3, 2008**

_____

The petitioner, Michael Derrick Huskins, appeals from the denial of his petition for post-conviction relief wherein he challenged his 2006 Polk County Criminal Court conviction of felony murder. In this appeal, the petitioner contends that his guilty plea was involuntary and was the result of the ineffective assistance of his trial counsel. Discerning no error, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which DAVID H. WELLES and ROBERT W. WEDEMEYER, JJ., joined.

Kenneth Miller, Cleveland, Tennessee, for the appellant, Michael Derrick Huskins.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany, Assistant Attorney General; and Brian Chapuran, District Attorney General pro tem, for the appellee, State of Tennessee.

**OPINION**

On January 26, 2006, the defendant entered pleas of guilty to felony murder and aggravated burglary in relation to the death of the victim, Alicia Gale Burger.[1] The State provided the following factual summary during the entry of the guilty pleas:

> On the date alleged in the indictment, this defendant was observed going into the home of the victim by two county employees. They were familiar with him and knew who he was. They observed him enter the residence shortly before the victim in this case arrived at that residence. The victim arrived and the same county employees observed . . . the victim going into the residence, and then they went

_____

[1]Despite entering guilty pleas to both felony murder and aggravated burglary, the petitioner challenges only the validity of his conviction for felony murder.

back to their work. They were working on a roadway above the house where this occurred. These same two workers then observed this defendant leave that residence sometime later. Law enforcement was called when . . . the body of the victim was discovered by her father. Investigation subsequently centered on this defendant, and upon taking him into custody, and upon doing an inventory of him and doing testing on his articles of clothing, the blood of the victim was found on his underwear. Additionally, there is a previous history between this family and the defendant. He was married to the sister of the victim. The defendant was taken into custody and certain statements were elicited from him that while not admitting to crimes, certainly made admissions that were damaging to any other defense that he might have.

At the post-conviction hearing, lead trial counsel recalled that the victim had been strangled, stabbed three times, beaten, shot five times, and her throat had been cut. He also remembered that "the deceased's car door was left open and a small child was left in there."

On January 18, 2007, the petitioner filed a petition for post-conviction relief alleging that his felony murder guilty plea was not knowingly, voluntarily, and intelligently entered and that he was denied the effective assistance of counsel. After the appointment of counsel and the filing of an amended petition, the post-conviction court held an evidentiary hearing on September 14, 2007.

In the hearing, the petitioner testified that he had been charged with both premeditated and felony murder in relation to the victim's death and that the State had filed a notice seeking the death penalty. The petitioner claimed that lead trial counsel met with him only "three or four times" and that co-counsel met with him "one more time than [lead counsel]." He asserted that neither lead counsel nor co-counsel would discuss defense strategy, and instead they focused their efforts at getting him to plead guilty to the charges. The petitioner also claimed that he informed his trial counsel of various infirmities with his pretrial statement to the police but that counsel insisted that the information was "irrelevant." He claimed that his counsel told him "there was no way [he] could be found innocent, that [he] was going to death row[,] and that [he] would never get to see his family again if [he] didn't sign those papers."

The petitioner insisted that he did not want to plead guilty and conceded to do so only after his counsel informed him that if he "got found guilty and got sent to death row, [he would] never be able to see [his] family again, which is a lie." The petitioner also contended that co-counsel told him "that a post-conviction relief was better than an appeal." He also testified that co-counsel "brought a psychiatrist to talk [him] into pleading guilty." He claimed that although his trial counsel arranged for a mental health evaluation, "they told [him] not to answer any of their questions about [his] case or anything like that. And then whenever [the] evaluation came back, it said that [he] wasn't being truthful."

The petitioner also contended that even though he knew that the plea agreement provided for a sentence of life without parole, he believed that he would be eligible for parole after serving 32 years' incarceration. He claimed that his trial counsel told him that "a life sentence is 32 years."

During cross-examination, the petitioner acknowledged telling the trial judge that he had not been threatened to enter his guilty plea but stated that he was "tricked into pleading guilty." The petitioner stated that the only reason he agreed to plead guilty was his desire to maintain visitation with his family. He denied that co-counsel had told him that he would be able to have "no contact" visitation with his family should he be sentenced to death. Although he specifically recalled telling the trial court that the visitation issue prompted his guilty plea, the petitioner exhibited only a spotty recollection of the remainder of the hearing, claiming that he could not recall telling the court that he was satisfied by the performance of his attorneys. The petitioner conceded that all the plea documents provided for a sentence of life without parole.

The petitioner's mother, Theresa Abercrombie, testified that she spoke with the petitioner's counsel on several occasions and claimed that "[f]rom the very beginning, they were wanting [her] to get [the petitioner] to go with a guilty plea." Ms. Abercrombie stated that counsel lied to her about statements provided by mitigation witnesses and that they refused to investigate the petitioner's drug addiction as a mitigating factor. She testified that trial counsel informed her that the petitioner's mental state at the time of the murder "didn't matter." She claimed that trial counsel "always just like, assumed like he was guilty and that [pleading guilty] was the best way to go."

Lead counsel testified that prior to being appointed to represent the petitioner, he had handled 43 homicide cases. He stated that he was appointed to represent the petitioner in the general sessions court and that he asked that the preliminary hearing be postponed until a mental health evaluation could be completed. The evaluation "indicated that [the petitioner] was competent to stand trial" and that a defense of insanity could not be supported. After learning that the State would likely seek the death penalty, lead counsel contacted co-counsel to assist him in the handling of the case and specifically with the gathering of mitigation evidence. Lead counsel stated that although he had some concerns about the petitioner's mental health, he never believed that the petitioner was incapable of understanding the proceedings. He stated that the petitioner "knew exactly what was going on, because he would get irritated at me when I would sit down and go over the case with him." Lead counsel also stated that he met with the petitioner at least "a dozen times . . . in the jail here in Polk County and the other jail where he was." With regard to the petitioner's entering his guilty plea, lead counsel testified that he was "confident [the petitioner] knew exactly what he was doing."

Lead counsel testified that in addition to seeking the services of co-counsel, he utilized the services of an investigator, who interviewed fact witnesses. Lead counsel stated that he apprized the petitioner of the status of his investigation on numerous occasions. Lead counsel recalled that the petitioner admitted murdering the victim, explaining to them that he had "lost control" and demonstrating how he had shot the victim. He also recalled that the petitioner claimed he had asked for and been denied an attorney during his interrogation. Based upon this claim, lead counsel prepared a motion to suppress the statement but did not file it due to the petitioner's decision

to plead guilty, which "put a halt to doing much else." Lead counsel denied that Ms. Abercrombie told him she felt threatened by officers who asked to search her house. He stated that he remembered her say "that she gave them a consent to search because she didn't have anything to hide."

Regarding the petitioner's demeanor at the guilty plea submission hearing, lead counsel stated, "I guess you had to work with [the petitioner] for three years to realize how he would try to manipulate things that really weren't necessarily important, but in his mind were." Lead trial counsel stated that he believed that it was in the petitioner's best interest to enter the guilty plea. He testified that he "felt like that the government had a very good felony murder case, and . . . think there were some enhancing factors, particularly the way the body was . . . dealt with in killing her, all the different stab wounds and shot wounds, that there was certainly enough there that had a jury wanted to give him the death penalty, they could have." Lead counsel stated that none of the petitioner's statements during the plea submission hearing gave him pause because he had no "doubt that [the petitioner] understood and was giving up his rights." Lead counsel testified that, even at the time of the plea submission hearing, he anticipated that the petitioner would file a petition for post-conviction relief.

Co-counsel, who testified that she had been practicing law for more than 19 years, recalled that lead counsel contacted her prior to the State's filing the death notice because he anticipated that one would be filed and he wanted her to begin preparing mitigation evidence. She stated that they "were looking at potential items regarding mitigation and [the petitioner's] mental health." She testified that they hired Doctor Robert Brown, a neuropsychologist, to assist them in their effort to address the potential mental health issues. During the investigation, she obtained the petitioner's mental health records and Doctor Brown administered further tests to the defendant. Co-counsel testified that after a mental evaluation and thorough review of the petitioner's mental health records with Doctor Brown, counsel concluded that the petitioner was competent and fully understood the proceedings.

Regarding the petitioner's decision to plead guilty, co-counsel recalled that she approached the petitioner in October 2005 with the State's offer and asked whether "he would be amenable to it." She testified that she "read each one of [the plea documents] to him and asked him if he understood, made sure he didn't have any questions at that time." Co-counsel stated that the petitioner was "agreeable to a plea" and signed the plea documents in October. A delay occurred when the State requested more time to discuss the agreement with the victim's family. After the victim's family expressed satisfaction with the agreement, a date was set for the plea submission hearing. Co-counsel denied that Doctor Brown accompanied her during the October visit, saying, "He just went with us one time, and that was at my request, to meet with [the petitioner], and that actually was on January the 18th, 2006, in Blount County at the Blount County jail." Co-counsel testified that she asked Doctor Brown to accompany her in January because "he had a good rapport with [the petitioner]" and because the petitioner "had tended to manipulate some of the situations with us [and she] wanted to make sure that there was absolutely no question that he understood what was going on." During the January visit, she again covered the plea documents "line by line" with the petitioner. She stated that Doctor Brown also attended the plea submission hearing for the same reasons. She stated she had no concern that the petitioner did not understand the consequences of

-4-

his guilty plea, explaining, "He knew and he could ask us questions about things, and he could verse those questions. He did come across as manipulative in situations when we would meet with him." Co-counsel testified that she was unaware of any potential literacy issue because the petitioner "could comprehend and read" discovery materials and later discuss them with counsel.

Co-counsel recalled that in addition to the mental health issues, she and lead counsel discussed the fact issues with the petitioner and interviewed a number of potential fact and mitigation witnesses. As a result of these interviews, co-counsel felt that it was "quite possible" the petitioner would be convicted and sentenced to death for the victim's murder. She stated that the petitioner's history of "extensive drug use," his prior violent outbursts, and the violent nature of the crime led her to this opinion. She recalled that one particular potential mitigation witness remembered the petitioner's saying that he "wanted to kill someone, that he was going to kill." She stated that she "just really had a hard time finding people to say good things" about the petitioner.

Co-counsel recalled that she discussed visitation with the petitioner because he "wanted to make sure that he continued to get to see his family." She stated that she contrasted the visitation rules for death row inmates with those in the general population but nevertheless assured the petitioner that "he would be able to have visits at both . . . they would just be different." She insisted that she never told the petitioner that he would be unable to see his family if he received a sentence of death. She stated that on the day of the entry of the plea, she discussed the proceeding with the petitioner and his mother for at least half an hour prior to the hearing. She recalled that during that time, the issue of visitation "never came up . . . . That was . . . why [she] was kind of shocked when we got out in front of the Judge that he even mentioned it, because he hadn't brought that up." Co-counsel also testified that she informed the petitioner "on more than one occasion" that a sentence of life without parole "meant he would absolutely be in there the rest of his life." At no point did the petitioner ever indicate to her that he thought he would be released after serving any number of years.

During cross-examination, co-counsel stated that lead counsel did not accompany her during the October visit with the petitioner because "a conflict" had arisen between the two men. She explained that lead counsel had decided to focus his attention on trial preparation while she attempted to "salvage the plea." She stated that she thought the strategy was appropriate given the petitioner's tendency to "try[] to manipulate situations." She testified that she reviewed the plea documents with the petitioner in January because of the time delay and because she wanted to explain that the victim's family had consented to the plea and that the theft charge would be dismissed. She stated that she did not feel it was necessary to explain the visitation protocol to the petitioner during the plea submission hearing because she had already done so and believed that "this was just one of [the petitioner's] ways of manipulating the plea."

At the conclusion of the hearing, the post-conviction court, in a written order detailing its factual findings and legal conclusions, held that the petitioner "has not presented any evidence that would sustain his Petition of Post Conviction Relief, and the same is hereby dismissed." The court found that the petitioner "knew what his rights were and what charges he was pleading to." The post-conviction court determined that although the petitioner had, in fact, expressed concern about being able to visit his family, his concerns had been alleviated during the course of the plea

submission hearing. The court concluded that the petitioner chose the "less severe of two bad choices" but there was simply "no proof that the Petitioner's plea was anything other than 'voluntarily and knowingly' made." The post-conviction court accredited the testimony of trial counsel that they had thoroughly investigated the case, including any potential mental health defenses, "and, once those evaluations showed that no insanity defense could be supported, they engaged in plea negotiations in an effort to obtain the best possible deal for their client." The post-conviction court found that the "[p]roof against the [petitioner] was not only overwhelming but also of such a nature, because of the excessively brutal nature of the killing, that certain enhancement factors could easily have been found by the jury to support the death penalty." The court concluded that the petitioner "offered no evidence at his hearing that would support his contention" that his guilty plea was the product of the ineffective assistance of counsel.

In this appeal, the petitioner challenges the post-conviction court's ruling, contending that his guilty plea was not knowingly and voluntarily entered because he was denied the effective assistance of counsel. The State contends that the petitioner has failed to establish his claims by clear and convincing evidence.

The post-conviction petitioner bears the burden of proving his or her allegations by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

*I. Voluntariness of Plea*

The petitioner first argues that his guilty plea was not voluntarily entered because he did not understand that he would be allowed to visit with his family even if he received a death sentence and that a sentence of life without parole did not provide for parole at any time.

Due process demands that a guilty plea be entered voluntarily, knowingly, and understandingly. *See Boykin v. Alabama*, 395 U.S. 238, 242-44, 89 S. Ct. 1709, 1711 (1969). "[T]he core requirement of Boykin is 'that no guilty plea be accepted without an affirmative showing that it was intelligent and voluntary.'" *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting *Fontaine v. United States*, 526 F.2d 514, 516 (6th Cir. 1975)). The plea must represent a "voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31, 91 S. Ct. 160, 164 (1970). A plea is involuntary if the accused is incompetent or "if it is the product of 'ignorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats.'" *Blankenship*, 858 S.W.2d at 904 (quoting *Boykin*, 395 U.S. at 242-43, 89 S. Ct. at 1712).

The *Boykin* requirement that guilty pleas be knowing and voluntary may stand independently of the claim that an unknowing or involuntary guilty plea is the result of ineffective assistance of counsel. *Boykin*, 395 U.S. at 241, 89 S. Ct. at 1711. The constitution requires that, to

satisfy due process, the trial court must inform the guilty-pleading defendant of his rights to avoid self- incrimination, to confront witnesses, and to be tried by a jury. However, "a guilty plea is not rendered constitutionally infirm because a criminal defendant is not informed about 'the details of his parole eligibility, including the possibility of being ineligible for parole.'" *Alan Dale Bailey v. State*, No. M2001-01018-CCA-R3-PC (Tenn. Crim. App., Nashville, Feb. 8, 2002), *perm. app. granted* (May 28, 2002), *voluntary dismissal granted* (July 11, 2002) (quoting *Rickey Sams v. State*, No. 03C01-9511-CC-00368, slip op. at 5 (Tenn. Crim. App., Knoxville, Nov. 14, 1996)). In this case, the petitioner's claims regarding visitation privileges and parole eligibility status are not constitution-based claims and, as a result, would not be cognizable in a post-conviction proceeding. *See* T.C.A. § 40-30-103 (2006) ("Relief under this part shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States.").

## II. Ineffective Assistance of Counsel

The petitioner also contends that his guilty plea was not voluntary because it was the product of ineffective assistance of counsel. Specifically, he contends that his counsel failed to adequately investigate the case, failed to advise him of available defenses, and misinformed him regarding the visitation privileges on death row and the unavailability of parole in a sentence of life without parole.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must first establish that the services rendered or the advice given were below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Second, he must show that the deficiencies "actually had an adverse effect on the defense." *Strickland v. Washington*, 466 U.S. 668, 693 (1984). The error must be so serious as to render an unreliable result. *Id.* at 687. It is not necessary, however, that absent the deficiency, the trial would have resulted in an acquittal. *Id.* at 695. Should the petitioner fail to establish either factor, he is not entitled to relief. Our supreme court described the standard of review as follows:

> Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component.

*Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).

On claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of

counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Claims of ineffective assistance of counsel are regarded as mixed questions of law and fact. *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457-58 (Tenn. 2001); *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

In our assessment, the petitioner has failed to establish that his trial counsel performed deficiently. Although the petitioner testified that his trial counsel misinformed him regarding visitation privileges and his eligibility for parole, both lead counsel and co-counsel denied providing incorrect information and the post-conviction court accredited this testimony. The post-conviction court also accredited the testimony of trial counsel that they thoroughly investigated the facts and circumstances of the case and the availability of mitigation proof. The post-conviction court shared the opinion of trial counsel that a conviction and sentence of death were very real possibilities in the petitioner's case. In addition, the record supports the finding of the trial court that the petitioner "knew what his rights were and what charges he was pleading to." The plea documents, signed twice by the petitioner, detail the charges, potential sentences, and rights available to the petitioner as well as the details of the plea agreement, including the sentence of life without parole. At the plea submission hearing, the trial court clearly outlined those rights the petitioner was giving up by entering his plea and the sentence that would be imposed as a result of the plea.

Accordingly, the judgment of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE